IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY DOCKET

**UNITED STATES OF AMERICA**

        **Plaintiff,**

  **v.**                               **Case No. 2:23-CR-20049-HLT**

**RITA HARTMAN,**

        **Defendant.**

---

**SENTENCING MEMORANDUM**

The United States of America respectfully submits this sentencing memorandum in the above-captioned matter.  For the reasons set forth below, the government recommends that this Court sentence the defendant to a term of imprisonment of 63 months.

**I.**    **OFFENSE CONDUCT**

Starting in at least 2007, and almost certainly earlier, the defendant used her role as the Manager for Muddy River Credit Union (MRCU) to steal at least $844,161.78 to enrich herself and her family.

The defendant embezzled money from MRCU in three primary ways.  First, she stole physical cash from at least 2010 to 2021 totaling $346,473.13.  PSR ¶¶ 16-18; Ex. C.  Second, she fraudulently credited her own and family members' MRCU share accounts without actually depositing any funds, totaling $381,434.23 from 2007 to 2017.  PSR ¶ 19; Ex. H at 1-4; Ex. H-1 to H-4, H-6 to H-7.  Third, the defendant fraudulently reduced family members' loan obligations

when the family member did not actually make a payment, totaling $116,254.42 from 2007 to 2018.  PSR ¶ 20; Ex. H-5, H-8 to H-11.[1]

All the while, the defendant used her role as the Manager and an array of false entries in MRCU's records to hide her tracks.  PSR ¶¶ 21-24.  Over the years, the defendant kept MRCU's general ledger manually, in hard copy, which made it easier for her to conceal her theft.  PSR ¶ 29.  The scheme continued until 2021, when a regulator-mandated audit immediately found discrepancies in MRCU's financial records—in particular, the significant amount of cash that was listed on MRCU's general ledger.  The audit was ordered in 2019.  The defendant delayed it until January 2021, at which point the regulators insisted that it be completed.  PSR ¶¶ 9, 29-30.  The defendant left MRCU and abruptly resigned just as the audit began.  PSR ¶ 10.  The audit later uncovered the foregoing methods of embezzlement and concealment.

The damage the defendant caused is significant.  The highest salary the defendant received from MRCU was approximately $89,000 in 2020.  The $844,161.78 she embezzled from 2007 through 2020, averaging approximately $60,000 per year, nearly matched her salary on an annual basis.  The defendant's embezzlement wiped out MRCU's capital and rendered it insolvent, ultimately forcing a merger into Frontier Federal Credit Union to continue operations.

## II.    PSR

The PSR calculates the defendant's base offense level at 7.  PSR ¶ 16.  The following specific offense enhancements were applied: a 14-level enhancement because the loss amount exceeded $550,000 (*id.* ¶ 38); a 4-level enhancement, because the offense substantially jeopardized the safety and soundness of a financial institution (*id.* ¶ 39); a 2-level enhancement,

---

[1] The government will present evidence, in the form of witness testimony and Exhibits H and H-1 to H-11, among others, in support of the figures in this sentencing memorandum.  These figures differ slightly from the amounts in the PSR, which were based on preliminary investigative reports.  The government will provide courtesy copies of its exhibits to the Court, Probation, and the defendant in advance of sentencing.

because the defendant abused her position of trust (*id.* ¶ 21); a 2-level enhancement, because the defendant obstructed justice by delaying an audit of MRCU (*id.* ¶ 42).

The defendant received a 3-point reduction based upon her acceptance of responsibility. *Id.* ¶¶ 45-46. Applying all the adjustments, the defendant's total offense level was calculated at 26. *Id.* ¶ 47. Based upon a total offense level of 26 and a criminal history category of I, the PSR calculates the defendant's sentencing range at 63-78 months. *Id.* ¶ 75.

### III.    APPLICATION OF SENTENCING GUIDELINES

#### A.    *The Court should apply the 14-level enhancement for amount of loss in excess of $550,000, pursuant to §2B1.1(b)(1)(H)*

The record before the Court, and which will be presented at sentencing, establishes by a preponderance of the evidence that the defendant's conduct resulted in a loss that exceeds $550,000. The defendant's guideline calculation appropriately contains a 14-level enhancement for an amount of loss greater than $550,000, pursuant to USSG § 2B1.1(b)(1)(H). The defendant objects and asserts she is responsible for only $477,610.84.

USSG § 2B1.1 (cmt. n.3(A)(i)) provides that "actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense. Comment n.3(A)(iv) provides that "reasonably foreseeable pecuniary harm" means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense. The Guidelines commentary provides that the district court "need only make a reasonable estimate of the loss" and its "determination is entitled to appropriate deference." USSG § 2B1.1 cmt. n.3(B).

##### i.    *CPA audit identified at least $844,161.78 in loss*

Certified Public Accountant Jerry Tenbrink conducted the MRCU audit. Government Exhibits C, H, and H-1 to H-11 detail how the defendant's actions contributed to a total loss of at

least $844,161.78.[2]  These exhibits were created by Mr. Tenbrink and support his audit and loss

findings.  Mr. Tenbrink will testify that the total amount stolen entails three primary aspects of

embezzlement: $346,473.13 in stolen cash (Exhibit C), $381,434.23 in fraudulent deposits

(Exhibit H, "Share" account credits), and $116,254.42 in fraudulent loan credits (Exhibit H,

"Loan" reductions).

        The defendant does not deny that she abstracted funds from MRCU.  Rather, she objects

to any loss amount attributed to her in excess of $477,610.84.  Specifically, she objects to a

portion of the loss identified in Exhibit H (fraudulent deposits and loan credits).  She concedes

that she stole physical cash totaling $346,473.13 (Exhibit C) from 2010 to 2021.[3]

        Exhibit H and the corresponding sub-exhibits demonstrate a consistent pattern of the

defendant using MRCU as her and her family's personal piggy bank.  A cursory review of

Exhibit H-1 (the defendant's Share 10 account) demonstrates this pattern.  Every sizable "share

deposit" is suspicious—the account is drawn down to almost nothing and then there's a deposit

into the account that cannot be confirmed, which is used for specific expenses (like paying the

dentist) or transferred immediately to the defendant and her husband's personal account at

Exchange Bank.  All of the share deposits that can be confirmed are in small amounts under

$1,000 (a few recurring, $691.21, others in amounts such as $33 or $50, or even $1.04 or $6.65).

None of the other share deposits are over $1,000, unlike those that have been identified as

fraudulent.

---

[2] Government Exhibit H-Supp. is largely duplicative of Exhibit H, but it is a consolidated version that Mr. Tenbrink prepared.  It focuses on certain transactions and highlights supporting evidence with annotations.  The transactions are from 2010-2017, the period for which the most records were available.

[3] In her initial PSR objections, the defendant denied taking physical cash.  In her subsequent objections, the theft of cash is included in her estimated loss of $477,610.84.  PSR ¶ 129.  Accordingly, the government understands that the objection in paragraph 134 has been withdrawn.

As just one example, on October 31, 2008, the defendant's MRCU share account was credited in the amount of $24,953.10. Ex. H-1 at 5. Over the ensuing weeks, the defendant issued checks to Central Mortgage ($800), Tate Plumbing ($620.57), and Gerber Electric ($6,990.50) and transferred $9,000 to her personal Exchange Bank account. *Id.* Before the $9,000 deposit, her Exchange Bank account had a balance of $452.63—the day after the deposit from MRCU, the defendant made two pay-by-phone debits, both in the amount of $3,015. Ex. 2008-11-RHJH, Ex. 2008-11-RHJH-images.[4] Over the next few months, the defendant continued to draw down her MRCU Share 10 account, including with $4,000, $3,600, and $2,000 transfers to her Exchange Bank account, until it was drawn down to $2,788. Ex. H-1 at 5-6. On February 13, 2009, the defendant again fraudulently credited her MRCU Share 10 account $15,281.26 and the same day issued a $10,000 check that she deposited into her Exchange Bank account. *Id.* at 6; 2009-02-RHJH, 2009-02-RHJH-images. Prior to the influx of cash, her Exchange Bank account had a negative balance of -$78.46. A few days after the $10,000 deposit from MRCU, the defendant made a $5,000 pay-by-phone payment. 2009-02-RHJH. The defendant does not appear to contest that these deposits into her Share 10 account were fraudulent.

The defendant's Share 515 account (Ex. H-2), her husband's share accounts (Exs. H-3 and H-4), and her daughter's share accounts (Exs. H-6 and H-7) demonstrate the same pattern, with no share deposits over $1,000 that could be confirmed. As an example, on February 16, 2012, the defendant's husband's account issued a $24,932.40 check payable to Bank of America

---

[4] The government has marked relevant account records for the defendant and her family's personal Exchange Bank accounts based on the year, month, and accountholder. For example, the statement and relevant check images for the defendant and her husband's November 2008 account statement are labeled as 2008-11-RHJH and 2008-11-RHJH-images, respectively. Whenever a withdrawal in H-1 to H-11 notes "To Exchange," the corresponding Exchange Bank account statement is easily identified by the exhibit number.

N.A., regarding "Karen Macpherson acct 13208612." Ex. H-4 at 3, 24. Karen Macpherson is the defendant's sister. PSR ¶ 57. This reduced Jeffrey Hartman's share account balance from $18,903.53 to a negative balance of -$6,028.87. His account was immediately credited $6,000 with an unsupported share deposit, bringing it to a positive balance of $21.13. *Id.* at 3, 25. On September 6, 2012, Melissa Wolfe, the defendant's daughter, had $2,674.40 in her Share 10 account. An unsupported share deposit of $16,000 was credited to her account and the same day a $15,644.08 check was made payable to Sears for "siding paid in full." Ex. H-6 at 3, 22-23. The defendant does not appear to contest that these deposits were fraudulent.

### ii.    *Defense Ex. H analysis is flawed*

The government anticipates that the defendant will rely on an alternative "Defense Ex. H analysis." This analysis notes which account and loan credits the defendant concedes were fraudulent and those she does not. She contends only $131,137.71 in deposits and credits were fraudulent. This analysis is based on many flawed assumptions or inferences.

First, the defendant contends that she should not be responsible for any fraudulent transactions in which another individual's name is listed as the teller. MRCU was a small credit union (typically just one employee other than the defendant) and it defies logic to suggest that another person would fraudulently credit *the defendant* and her family's accounts or reduce their loan obligations. For example, on September 13, 2013, the defendant's account was credited $8,000 and the teller's name is listed as "Stacy"—a reference to Stacy Holmes, who worked at MRCU at that time. Ex. H-2 at 4, 39. The same day as the fraudulent deposit, the defendant issued a $2,300 check for pictures for her daughter's wedding (to take place on June 7, 2014). Ex. H-2 at 41. A few days later, the defendant issued a check to "Always Blooming" for $1,104.69 for flowers for the wedding. *Id.* at 42. As another example, shortly after Christina (Chrissy) Dunn started at MRCU, on September 24, 2014, the defendant's husband's account

was credited $10,000 and the teller's name is listed as "Chrissy." Ex. H-3 at 3, 14. Prior to the fraudulent deposit, Jeffrey Hartman's MRCU share account had $370.48. Contemporaneous with the fraudulent deposit, $6,000 was transferred to the defendant and her husband's Exchange Bank account. *Id.* at 3; Ex. 2014-09-RHJH, 2014-09-RHJH-images. Prior to the influx of $6,000, their Exchange Bank account had a balance of $489.23. Ex. 2014-09-RHJH. A few days later, they paid $4,000 to Citicards. Ex. 2014-10-RHJH, 2014-10-RHJH-images.

If the defendant continues to dispute these transactions, the government will call Ms. Holmes and Ms. Dunn as witnesses. The government anticipates that Ms. Holmes and Ms. Dunn will testify that they did not cause any such deposits to be made into the defendant's accounts. Ms. Holmes said that when she started, the defendant provided her a username and password to log into MRCU's systems. Moreover, the defendant acknowledges that "Stacy" is listed as the teller for a $4,000 transaction on June 24, 2014—when Ms. Holmes was no longer employed at MRCU. Ex. H-1 at 9, 154-157. The same day as the $4,000 deposit, the defendant paid the Atchison County Treasurer $733.77 and a couple days later she issued a $2,000 check that she deposited to her Exchange Bank account and used to pay Citicard in the amount of $1,900.65, drawing her Exchange Bank account balance down to $233.53. *Id.*; 2014-07-RHJH, 2014-07-RHJH-images. Ms. Holmes left MRCU around 2013, because she observed red flags with the defendant's management of MRCU, including excessive loans to family members, personal loans without sufficient approval, and the defendant manually changing loan balances in reports to regulators.

Second, the defendant contends that she should not be held accountable for most transactions prior to 2010 (a period from which there are fewer records available), because unsupported credits to her account could have been large cash deposits. This asks the Court to

7

assume that the defendant consistently made large cash deposits into her and her family's MRCU accounts—in amounts such as $17,000, $20,000, $15,000, $3,500, $5,000, and $6,000—with no explanation of the source of these significant sums.  And it asks the Court to ignore that this pattern is consistent with her conduct from 2010 to 2020, when more records are available.  For example, on February 27, 2007, the defendant's share account had a balance of $81.20.  There was an unsupported $17,000 deposit into the account and the same day two checks—$15,000 and $1,000—were made payable to Citibank.  H-1 at 1, 18.  On August 24, 2007, the defendant's share account had a balance of $522.07.  There was an unsupported $20,000 credit to the account and the same day a $15,000 check was physically deposited in the defendant's Exchange Bank account (which was a half-mile from MRCU).  Ex. H-1 at 2, 31.  The defendant's Exchange Bank account had a pre-existing balance of $1,147.40 and there were multiple payments out of account from August 24, 2007 to August 28, 2007, including a $12,015 debit on August 28, 2007.  Ex. 2007-08-RHJH, 2007-08-RHJH-images.  The government believes that the defendant will dispute that these transactions were fraudulent (on some hypothetical theory that they could possibly have been cash deposits), even though they have all the hallmarks of the defendant's other fraudulent account credits.  It would make no sense for the defendant to deposit $20,000 cash into her MRCU account, and then immediately send $15,000 to her Exchange account if this was a legitimate transaction.  She would have simply deposited $15,000 in her Exchange account if she had the funds to do so.

Another example that demonstrates the implausibility of the defendant's contention is a $4,000 unsupported share deposit into her Share 10 account on October 4, 2007 (which had a pre-existing balance of $1,435.24 prior to the unsupported deposit).  The same day, she paid Countrywide Mortgage $800, Central Mortgage Company $800, and issued herself a $2,000

check, which she physically deposited in her Exchange Account the next day.  Ex. H-1 at 2, 35-37.  When she deposited the $2,000 check, she chose to receive back $1,000 cash.  Ex. 2007-10-RHJH, 2007-10-RHJH-images.  If the defendant had access to $4,000 cash, it does not make sense to deposit it in her MRCU share account, immediately issue a $2,000 check, go a couple blocks to Exchange Bank and deposit $1,000 and receive $1,000 cash back.  Moreover, neither Ms. Holmes nor Ms. Dunn witnessed the defendant deposit large sums of cash in her or her family's share accounts or pay down loan obligations.

Third, for 2010 through 2021 (when more records are available to determine how transactions were entered into MRCU's system), the defendant suggests that any time *she* coded an unsupported transaction as a cash deposit the Court should assume she in fact deposited cash—if, that is, there are any cash deposits by MRCU into its Exchange Bank account around the time of the purported cash transaction.  This is, of course, during the same time that the defendant was admittedly stealing incoming cash and not depositing it into MRCU's Exchange Bank account.  The defendant's argument is further belied by the fact that in other instances she coded fraudulent transactions as cash deposits, but there are no corresponding cash deposits into MRCU's Exchange Bank account—the defendant appears to concede these are fraudulent and that she did not, in fact, deposit cash.  *See* Ex. H-2 at 1, 9 ($900 deposit on 11/22/2010); Ex. H-2 at 1, 10 ($800 deposit on 11/23/2010); Ex. H-2 at 2, 26 ($4,000 deposit on 10/21/2011).

Finally, there is no other legitimate, verifiable banking activity that would support the notion that the defendant had access to large sums of cash and deposited it in her accounts.  To the contrary, her activity is suggestive of someone living beyond their means and stealing to finance their lifestyle.  This is demonstrated by the repeated pattern of accounts being drawn down to small or even negative balances.  Large MRCU deposits that cannot be confirmed are

then credited to the account and often immediately transferred to the defendant's personal Exchange Bank account. The nature of the defendant's banking activity is underscored by the thousands of dollars in overdraft fees that she incurred on her Exchange Bank account. *See* Ex. 2007-12-RHJH ($1,196 in 2007); Ex. 2008-12-RHJH ($998 in 2008); Ex. 2009-12 ($754 in 2009); Ex. 2010-12-RHJH ($431 in 2010); Ex. 2011-12-RHJH ($60 in 2011); Ex. 2012-12-RHJH ($672 in 2012); Ex. 2013-12-RHJH ($544 in 2013); Ex. 2014-12-RHJH ($224 in 2014); Ex. 2015-12-RHJH ($574 in 2015); Ex. 2016-12-RHJH ($306 in 2016); Ex. 2017-12-RHJH ($136 in 2017); Ex. 2018-12-RHJH ($102 in 2018). This is not consistent with someone who has access to large amounts of cash.

It is also significant that there are no fraudulent account credits or loan payments after 2018. Around that time, the general ledger was moving to electronic format and would no longer be kept exclusively by hand by the defendant, which made it harder to conceal her activity. The regulators were also starting to ask more questions at this time. It is telling that there are no large "cash" deposits into the defendant's share accounts from that point forward. *See* Ex. H-1 at 12-13 (after 2018, only confirmed check deposits). This strongly suggests that none of the supposed cash deposits were legitimate.

      *iii.*     *The government's proposed loss figure is conservative and understates the full scope of the defendant's fraud*

The loss amount proffered by the government necessarily understates the true harm caused by the defendant. The government's figure only covers 2007 through 2021, based on the records that were available when the defendant's fraud was uncovered. However, the defendant was embezzling money as early as 2002, when she recorded an inflated cash amount on MCRU's general ledger of $211,681 but reported just $149 in cash on hand on the call report submitted to

regulators. Ex. D. It would also be a remarkable coincidence if the beginning of the defendant's fraud coincided with the exact moment that records were available starting in 2007.

The Court can also find that the government's proposed loss amount is a reasonable proximation of loss, because it is corroborated by the amount in inflated assets that were used to conceal the defendant's ongoing theft. Mr. Tenbrink's audit observed approximately $948,160 in assets that did not exist, and which effectively concealed the defendant's fraud until the audit uncovered it. This was comprised of Security Repurchase Agreements (SRAs) or Certificates of Deposit (CDs) on MRCU's books that did not exist ($666,632) and inflated cash ($281,528).

The record before the Court, which will include testimony from Mr. Tenbrink, establishes that the defendant's scheme resulted in a reasonably foreseeable loss of at least $844,161.78. Accordingly, the Court should overrule the defendant's objection to the 14-level increase under USSG §2B1.1(b)(1)(H).

### B. The Court should apply the 4-level enhancement for substantially jeopardizing the safety and soundness of a financial institution, pursuant to §2B1.1(b)(17)(B)(i)

The record establishes by a preponderance of the evidence that the defendant's base offense level should be increased by four levels, because her conduct jeopardized the safety of MRCU. The government addressed the applicability of this enhancement in its response to the defendant's PSR objections. PSR ¶¶ 141-144. If the defendant persists in this objection, the government anticipates that Mr. Tenbrink, NCUA regulator Karen Gottesburen, and Frontier Community Credit Union President Michael Augustine will testify regarding how the defendant's conduct substantially jeopardized the safety and soundness of MRCU, including rendering it insolvent, making it unable on demand to refund fully its members' deposits, and so depleting it of assets that it was forced to merge into Frontier to continue active operations.

Accordingly, the Court should deny the defendant's objection to the 4-level enhancement for substantially jeopardizing the safety and soundness of a financial institution, pursuant to § 2B1.1(b)(17)(B)(i).

### C. *The Court should apply the 2-level enhancement for obstruction*

The record establishes by the preponderance of the evidence that the defendant obstructed justice when she sought to delay the NCUA's audit starting in 2019 and continuing through January 2021, when she abruptly retired. The government addressed the applicability of the 2-level enhancement pursuant to § 3C1.1 in its response to the defendant's PSR objections and does not repeat those arguments here. PSR ¶¶ 119-126. The Court should deny the defendant's objection to the obstruction enhancement.

## IV.   <u>GOVERNMENT'S SENTENCING RECOMMENDATION</u>

This Court must "impose a sentence sufficient, but not greater than necessary" to address the factors enumerated in 18 U.S.C. § 3553, including the Guidelines issued by the U.S. Sentencing Commission. Society places its trust in financial institutions and the people that are responsible for running them. Fiduciary relationships are central to a functioning economy. When people like the defendant abuse the trust of their employers and members, the ripple effect is profound. As the CEO of Frontier Community Credit Union explained in his victim impact statement, the defendant's actions had, and continue to have, real consequences for MRCU's members. PSR ¶ 32.

In light of the scope of the offense—the loss amount; the damage to MRCU and the Atchison community; the length of time the defendant continued the scheme; and her abuse of the trust placed in her by others MRCU—the United States recommends a low-end guideline sentence of 63 months' imprisonment.

V.       **RESTITUTUION REQUEST**

The Mandatory Victims Restitution Act provides that the Court "shall order, in addition to . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1).  The Court must order restitution to each victim for the full amount of loss. 18 U.S.C. § 3664(f)(1)(A).  The United States requests that the Court order full restitution in the amount of $844,161.78.  The Crime Victims' Rights Act affords Frontier Community Credit Union, as the successor to MRCU, the right to full and timely restitution.  18 U.S.C. § 3771(a)(6).

As part of the restitution order, the governments ask the Court to order the defendant to turn over her pension payments during her term of incarceration and submits the following in support of its request:

_Financial Condition and Ability to Pay_

In response to a request from the United States, the defendant provided a Financial Disclosure Statement indicating she currently receives income from Social Security, a $430.86 per month pension from the Pension Benefit Guaranty Corporation (PBGC), part-time employment, and rental income.  The defendant disclosed minimal assets, including life insurance policies with approximately $35,000 in cash value, a 401k with a balance of approximately $32,000, three jointly owned older vehicles with nominal liquidation value, bank accounts with nominal values, and jointly owned common stock in Evergy.  On her Financial Disclosure Statement, the defendant indicated she did not own any real estate but provided the following note:

House & Property in daughter
Melissa Wolfe name.

We live here pay real Estate taxes
Montly Insurance and Repairs.

Rental property nexdoor get $400.00
Month rent. This pays real
estate taxes & Insurance on
Both Propertics.
Real Estate taxes last year
$4,250.00.

Initially, the defendant denied selling or gifting any property within he past six years:

| | | |
|---|---|---|
| ☐ Yes ☒ No | Have you or your spouse sold any property valued at $15,000 or more in the past six (6) years? *If yes, provide the name and address of the buyer, a description of the property, the fair market value, and the price paid:* | |
| ☐ Yes ☒ No | Have you given any gifts of $5,000 or more in cash or property to any family members, friends, or business associates in the past six (6) years? *If yes, provide the name and address of the recipient and a description of the gift:* | |

However, after the United States provided a copy of a General Warranty Deed to her attorney, which showed that the defendant and her husband deeded their residence to their daughter in 2020, the defendant provided the following amendments to her Financial Disclosure Statement:

14

| | | |
|---|---|---|
| ☒ Yes ☐ No | | Have you or your spouse sold any property valued at $15,000 or more in the past six (6) years? *If yes, provide the name and address of the buyer, a description of the property, the fair market value, and the price paid:* Melissa Hartman-Wolfe, 6526 Ottawa Road Atchison, Ks 66002. South 18th Streetis property. Do Not Know value. |
| ☒ Yes ☐ No | | Have you given any gifts of $5,000 or more in cash or property to any family members, friends, or business associates in the past six (6) years? *If yes, provide the name and address of the recipient and a description of the gift:* See Answer Above - Melissa Wolfe - 6526 Ottawa Road |

I marked No the first time Because I did Not Know the date this took place. There was no fraud intended. This Was done upon the advice of my husbands doctor. He had 3 brain surgeries in one Year. Our attorney said Melissa need to give us a $1.00 That Was the Only Money exchanged.

The defendant and her husband executed the General Warranty Deed transferring title to the real estate on December 31, 2020, and filed it with the Atchison Register of Deeds on January 11, 2021. According to the Atchison County Appraiser, the residence is valued at $268,720.00 for 2025 and contains a 4 bedroom, 2 bath, bi-level home with 1,404 square feet of living area, as well as a separate one bedroom, one bath home with 686 square feet of living area. The couple rent the second home on the property for $400 per month, which the defendant reports they use to cover annual tax and insurance expenses for both houses.

The government may pursue recovery of this property as a fraudulent transfer pursuant to Subchapter D of the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 et seq.,

considering the defendant transferred her interest without receiving reasonably equivalent value in exchange for the transfer and the timing of the transfer coincided with the Kansas State Bank Examiner's identification of unusual items on the general ledger of the MRCU, which ultimately led to the indictment in this case.  PSR ¶¶ 7-10.  If title to the real estate is restored to the names of the defendant and her husband, the United States' lien will attach to the property pursuant to 18 U.S.C. § 3613(c).

Based on the current financial circumstances of the defendant, even if the defendant were to liquidate all current assets and account for future recovery of 15% of her Social Security benefits through the Treasury Offset Program following her release from incarceration, it is highly unlikely that the defendant will be able to pay restitution in full before the liability expires 20 years after her release from incarceration. The United States is unable to garnish the defendant's pension payment because, based on the amount of the payment, the maximum allowable garnishment under section 303 of the Consumer Credit Protection Act (15 U.S.C. § 1673), as made applicable to enforcement of criminal restitution pursuant to 18 U.S.C. § 3613(a)(3), is zero.

### _Request to Turn Over Pension Payments During Incarceration_

Since the United States is unable to garnish the pension payments, the United States requests the Court order turnover of the defendant's PBGC pension payments for application to her criminal monetary penalties during her term of incarceration.  The United States may enforce an order of restitution "in the manner provided for in subchapter C of chapter 227 and subchapter B of chapter 229 of Title 18; or by all other available and reasonable means."  18 U.S.C. § 3664(m)(1)(A).

Title 18, section 3664 grants the Court broad authority to specify how a defendant will pay restitution and to set the schedule of payment:

> (f)(2): Upon determination of the amount owed to each victim, the court shall, pursuant to section 3572, specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of—
>
> > (A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;
> > (B) Projected earnings and other income of the defendant; and
> > (C) Any financial obligations of the defendant; including obligations to dependents.
>
> (f)(3)(A): A restitution order may direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments.
>
> (n): If a person obligated to provide restitution, or pay a fine, receives substantial resources from any source, including inheritance, settlement, or other judgment, during a period of incarceration, such person shall be required to apply the value of such resources to any restitution or fine still owed.

Ordering turnover of the defendant's monthly pension payment during the term of her incarceration falls within this authority.

The defendant does not have any dependents; however, the United States acknowledges that her husband relies on the defendant's income to support their joint household. Without the defendant's part-time earnings and Social Security benefits, which will cease during the defendant's incarceration, Mr. Hartman is left with his own Social Security benefits, income from part-time employment, and a small pension. The couple's necessary household expenses are minimal since they have no home mortgage or rental expense, so Mr. Hartman should have sufficient income to meet his basic living expenses; although, the United States acknowledges that he may not be able to continue to service the couple's credit card debt.

Not only does the Court have authority to order turnover of the defendant's monthly pension payment during the term of her incarceration, but the Court has an obligation under the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771 *et seq.*, to ensure that crime victims are afforded their rights, including "[t]he right to full and timely restitution as provided in law." 18 U.S.C. § 3771 (a)(6) and (b)(1). Since the pension payments are not necessary for the defendant to meet her basic needs while incarcerated, as her basic needs will be met by BOP, the pension payments should be applied to the restitution order to provide immediate compensation to the victims in this case.

Turnover of the defendant's monthly pension payment may be included in the judgment as part of the payment schedule and the United States recommends that the Court do so. If so ordered, the United States intends to move the Court for orders directing PBGC to pay the funds due to the defendant directly to the Clerk of Court.

## VI.   CONCLUSION

For the foregoing reasons and the facts set forth in the PSR, the Government respectfully submits that a guidelines sentence sufficient, but not greater than necessary, to address the factors in section 3553. Consistent with the parties' plea agreement, the government anticipates that its recommendation will be a sentence of 63 months, at the low end of the guideline range calculated in the PSR.

Respectfully submitted,

RYAN A. KRIEGSHAUSER
UNITED STATES ATTORNEY

By: */s/ Ryan J. Huschka*
Ryan J. Huschka
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas
500 State Avenue, Suite 360

Kansas City, KS 66101
Ph. 913-551-6730
Fax 913-551-6754
Ryan.Huschka@usdoj.gov
Ks. S. Ct. No. 23840

By: */s/ Michelle McFarlane*
Michelle McFarlane
Assistant United States Attorney
District of Kansas
500 State Avenue, Suite 360
Kansas City, Kansas 66101
Ph: (913) 551-6730
Fax: (913) 551-6541
Michelle.McFarlane@usdoj.gov
Ks. S. Ct. No. 26824

## Certificate of Service

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

September 30, 2025

/s/ *Ryan J. Huschka*

RYAN J. HUSCHKA
*Assistant United States Attorney*