# In the United States District Court
## for the District of Kansas

**United States of America**,
          Plaintiff,

v.                                                  Case No. 23-20049-HLT

**Rita Hartman**,
          Defendant.

## Sentencing Memorandum

On the evening of January 17, 2021, Melissa Wolfe received a phone call she will never forget. When she answered the incoming call from her mom, Rita Hartman, Rita's first words were: "I just tried to kill myself." Exhibit 1, Interview of Melissa Wolfe. Rita called her daughter from Muddy River Credit Union (MRCU), a small financial institution in Atchison, Kansas, where Rita had worked for over four decades. PSR at ¶ 68. Melissa immediately called one of her mom's co-workers to unlock the door of MRCU. Ex. 1. In disbelief, she rushed over to the credit union to find her mom with blood running down her arm and all over her shirt. *Id*. A pool of blood and a boxcutter lie on the floor of her office.

Melissa vividly recalls how disoriented her mom was because she had never seen her mom in that state before. She describes the look in Rita's eyes as "psychotic." *Id*. Rita insisted that Melissa, a nurse practitioner, take her home and get her "stitched up." Melissa thought it necessary to turn the child safety lock on

1

when she told her mother that they were headed to the hospital, not home. *Id*.

 

During the ride, Rita rambled about the other ways in which she should have killed herself. *Id*. She was admitted into the hospital for a 96-hour psychiatric hold. *Id*. She was also treated for the self-inflicted injury to her arm. She stayed at the hospital for about a week before she was released with a prescription for an anti-depressant. *Id*. According to Melissa, her mom has never been the same. *Id*.

On October 8, 2025, this Court will sentence Rita Hartman for her guilty plea to one count of false entries in federal credit institution records. We begin here because, as demonstrated below, this traumatic, life-altering event and the circumstances surrounding it set the stage for the factors this Court is required to consider when determining what sentence is "sufficient, but not greater than necessary, to comply with the purposes" of § 3553(a). 18 U.S.C. § 3553(a). Notwithstanding several hundred thousand dollars of loss, we submit that the appropriate sentence for Rita is a non-custodial one. A review of the pertinent § 3553(a) factors supports the requested sentence.

A. **Nature and Circumstances of the Offense**

On February 4, 2025, Rita pleaded guilty to Count 15 of a 29-Count indictment charging false entries in federal credit institution records in violation of 18 U.S.C. § 1006. PSR at ¶ 3. Specifically, she admitted to falsely recording the purchase of three security repurchase agreements (SRAs) totaling $250,000 in MRCU's general ledger, artificially increasing the total balance from $600,000 to $850,000. D.E. 38 at 4-5. Her willfulness in making this false entry was evidenced by the fact that she certified to auditors the true amount of SRAs held at Exchange Bank and Trust as of December 31, 2014, was $375,000, not the $850,000 she indicated on MRCU's books. *Id*. At the time of the offense, Rita was the manager of MRCU. *Id*. at 2. She had been an MRCU employee for at least 40 years. *Id*. She almost exclusively maintained MRCU's books by hand during her tenure. *Id*. An FBI investigation into MRCU revealed that Rita embezzled funds from the credit union over a period of time.[1] Her conduct resulted in the loss of several hundred thousand dollars.[2] During a March 2023 interview, Rita told FBI agents: "I didn't look at it as giving the credit union's money away, I looked at it as helping somebody, and I was always gonna figure out a way to get that money back." *Id*. at 5.

---

1 The government alleges this time period precedes 2007, but it substitutes presumption for actual evidence or records on this subject.

2 Mrs. Hartman objects to the government's estimated loss amount of $809,837.13 and its theory of how the fraud was perpetrated. We believe the correctly calculated amount is approximately $477,610.84. See PSR at ¶ 129. This difference has the potential to impact the federal sentencing guidelines range. The parties will have a contested evidentiary hearing on October 8, 2025. Counsel reserves argument on this objection for the hearing. Nevertheless, Mrs. Hartman's request for a non-custodial sentence is not contingent upon the Court's final loss amount determination.

The FBI initiated an investigation into MRCU when a supervisory examiner with the National Credit Union Administration contacted the federal agency regarding potential embezzlement at the credit union in October 2021. *Id*. at 2. The embezzlement suspicions came from an audit conducted the same year by Jerry Tenbrink, a certified public accountant hired to conduct an outside audit of MRCU.

It is no coincidence that Rita's suicide attempt occurred around the time this audit was looming over MRCU.  The audit alone, however, does not paint a complete picture of the totality of stressors that contributed to her mental break. The backdrop for Rita's suicide attempt was colored by the global COVID-19 pandemic. In early 2021, the world was tentatively returning to "normal" as people navigated the effects of a year-long isolation, the death of loved ones, and ever-changing safety protocols to protect the population most vulnerable to COVID.

Furthermore, Rita had been experiencing several major stressors in her personal life in early 2021. Chief among them was the health of Jeff Hartman (J.D.), her husband of over 50 years. Just a few weeks prior, during the Christmas 2020 holiday, J.D. had been hospitalized, yet again, for hydrocephalus. Ex. 1 at 3. Simply put, he has too much fluid on his brain. *Id*. Exhibit 2, Letter from Melissa Wolfe. JD has had approximately 10 brain surgeries to treat the condition, and Rita is his primary caretaker. *Id*. The overwhelming stress of caring for a loved one who is constantly and unexpectedly at risk of death took a toll on Rita's mental health. The overall concern for husband's health, as well as her own, was exacerbated by the pandemic.

4

While Rita regularly underwent audits over the years as the manager of MRCU, the 2021 audit process was particularly stressful due to challenges coordinating with the Jerry Tenbrink's office.[3] More importantly, the audit prevented her from helping people in the way she had become accustomed to working with MRCU clients in financial crisis. Exhibit 3, Interview of Rita Hartman. In fact, Rita's recollection of the day she attempted suicide includes a negative encounter with a client (believed to be named "Ron") to whom she had to deny assistance.

Rita recalls that Ron had a disabled wife and two young children. Ron's opportunities for overtime at a local plant had been cut. His wife could not work, but she also had not yet received any disability pay to contribute to the household needs. Before the audit, MRCU assisted Ron with his "open end" loan by adding onto the loan in amounts of several hundred dollars. This would help him to pay his rent. Because Ron's payments were made through payroll deduction, Rita knew the credit union would receive automatic payments. As was its custom, MRCU's Advisory Board approved this approach. *See* Exhibit 4, Example of Advisory Board Notes Approving Changes for Customers at 8, 17-19, 21, 23 & 25.

The 2021 audit changed this practice. Rita recalls the auditor telling her that MRCU needed to stop this practice. Exhibit 3. The board agreed. *Id*. Ron and his wife did not take this news well. They reminded Rita that she had always been there for their family. *Id*. Subsequently, Rita learned that Ron's family had to leave

---

3 This is another contested issue between the parties. Mrs. Hartman objected to a two-level enhancement for obstruction of justice. See PSR at ¶ 115. The parties will litigate this issue at the sentencing hearing.

their rental home and move into a hotel. *Id*.

On the Sunday morning of Rita's suicide attempt, Ron saw her car at the credit union and stopped by. *Id*. He pleaded with Rita for help so his family would not become homeless. *Id*. at 2. Rita told him that she would no longer be able to help them. Ron and his wife continued to call the bank after he left MRCU. The tenor of their pleas went from desperation to anger. Rita recalls that Ron's wife "called her every name in the book." *Id*. She told Rita that it would be her fault when their kids had no place to sleep. *Id*. Rita couldn't handle this pressure. Her inability to help this family was the proverbial straw that broke the camel's back.

While none of this context excuses Rita's conduct in this case, she hopes the Court will take into consideration the circumstance discussed above, her lack of criminal history, her acceptance of responsibility, her post-retirement efforts establishing employment in accordance with her conditions of pretrial supervision, her ability to work and potential to make restitution, as well as the value she adds to both her family and her community. Rita feels deep shame about this case and her conduct. She is committed to never engaging in criminal conduct again.

### B. Rita Hartman's History and Characteristics.

Rita Hartman is a 70-year-old lifetime resident of Atchison, Kansas. PSR at ¶ 57. She recalls growing up in the country as a young girl wearing dresses that her mother made out flour sacks that her dad brought home from the local flour mill. *Id*. at 58. Rita met her husband, J.D., in high school. *Id*. They have been married over 50 years.  Rita and J.D. raised a daughter together, and they help care for their

6

three grandchildren ranging from four months old to eight years old. For most of her adult life, Rita worked with the credit union. *Id.* at 69. She is currently employed at a childcare center in Atchison, tending to small children for several hours each morning.

Willingness to help others is a part of Rita's DNA. In a compilation of letters from family and friends, this Court will learn that the people who know Rita Hartman best describe her as kind, loving and always ready to help others. *See* Exhibit 5, Character Letters. Kim Bartlett, Rita's friend of 20 years, wrote:



*Id.* Michelle Urban, Rita's friend and neighbor of 46 years, said, "In everything we've always shared, her e is always ready to help someone." *Id.* J.D.'s letter to the Court provides a recent anecdote in which "Rita is still helping others." Exhibit 6. Rita attended CPR training for her job at the daycare. *Id.* As a result of the training, she realized that her facility did not have an automated external defibrillator (AED). She quickly learned that there was no AED in the building because the provider could not afford the expensive equipment. *Id.* Rita took it upon herself to find a grant application for the director of the daycare. Within a week, the

7

grant application was approved, and within six weeks, the AED arrived. *Id*.

1. **Rita the Changemaker**

Rita Hartman's instinct to take action to improve the lives of others goes all the way back to a time when her now 43-year-old daughter was a young child. She attended an Atchison city commission meeting to advocate for better parks for her daughter and the children in her neighborhood. PSR at ¶70.  This advocacy led to a position on Atchison's Park Board. Her role in keeping Atchison parks open despite developers' plans for building homes in these public places, led to Rita becoming the city commissioner. *Id*. Rita Hartman's dedication to public service and the improvement of the Atchison community overall eventually resulted in her election as mayor of the city. She organized volunteers for the annual Amelia Earhart festival. *Id*. Rita fondly remembers a project in which she organized an effort to have an American flag flown on every house in the city. *Id*. As mayor, she worked to improve the lives of every Atchison citizen. According to Chris Wessel, writer for Atchison Life Newspaper in 1999, she was successful: "Atchison is a better place because of Mrs. Hartman." Exhibit 7, Newspaper Articles.   Below is a small selection of Articles featuring Rita's public service.



City Clerk Phyllis Walton, left, swears in Dennis Beaver, Bill Murphy and Rita Hartman on Monday as the newly elected city commissioners took office. Mrs. Hartman later was elected by commissioners to serve a second term as mayor.



Surrounded by NEK Head Start preschoolers, Mayor Rita Hartman signs a proclamation after lunch Tuesday at the Mount Community Center declaring April 18-24 as "The Week of the Child."



Deborah Gregory, a volunteer for the Amelia Earhart Festival and chairwoman for the Mall committee, picks up her volunteer shirts Tuesday at the Atchison Area Chamber of Commerce, while festival committee members Rita Hartman, Michelle Urban, Tesia Kearney and volunteer chairwoman Ginger Henninghake makes Mrs. Gregory gets the right shirts and assignments for the festival.



Debbie McGuire, left, Darlene DuLac, Debbie Sundby and Rita Hartman gather bright posies together for purchase Saturday during a flower sale at the Farmer's Market to benefit Mount St. Scholastica Academy.

9

### 2. Rita the Caregiver

In addition to providing daily afternoon childcare for her granddaughters and caring for her 87-year-old mother, Rita is the primary caretaker for her husband. J.D. Hartman will tell anyone who asks: "Rita has saved my life many times." Exhibit 6. He's been dealing with a brain condition since he was 40 years old. *Id*. J.D. depends on a shunt in his brain to remove excess fluid and manage his condition. *Id*. Unfortunately, he will deal with this condition for the rest of his life. It can become life-threatening at any moment. The symptoms show up as memory loss, dizziness, confusion and projectile vomiting. JD has been blessed with a wife and caregiver who has learned to recognize when JD is "sick". Exhibit 2. From there, J.D. has a short window to get to a neurosurgeon to prevent imminent death.

### 3. Rita's Health

After Rita's attempted suicide in 2021, Melissa sought out "neuorphsych testing" for her mother. Exhibit 1. Melissa noted that she began to see a decline in her mother's cognitive functioning and wanted to verify whether her mother was showing signs of dementia. *Id*. She was equally concerned about her mother's mental state following the suicide attempt. The father of Melissa's children voiced concerns about the safety of the girls since Rita played such a vital role in their childcare plan. The PSR notes that Rita was diagnosed with transient global amnesia in 2018, three years before the Tenbrink audit and attempted suicide. PSR at ¶ 62. Melissa recalls this diagnosis and instances where her mom wouldn't

remember things and appeared confused. Exhibit 1.

### C. The need for the sentence to reflect the seriousness of the offense, deter criminal conduct, and protect the public.

1. **The seriousness of the offense**

The critical factors driving Rita's guidelines range are the loss amount, her role as the manager of MRCU and the effect of that loss on the safety and soundness MRCU. This is a serious offense. Notwithstanding the severity of Rita's crime, imposing a custodial sentence would do nothing to alleviate that loss or repair the harm. In fact, it would have the opposite effect of delaying or at least severely restricting Rita's ability to make meaningful restitution. Imposing a term of supervision with a condition for home confinement instead would sufficiently punish Ms. Hartman while allowing her to maximize the amount of restitution she could repay from her earned income. A term of supervision would provide a mechanism by which this Court could enforce payment of restitution and monitor Ms. Hartman's financial circumstances in accordance with the proposed special conditions of supervision.

2. **The need to deter criminal behavior and protect the public**

Rita's criminal history is nonexistent. The PSR indicates no prior contact with law enforcement, no pending charges, no prior adult or juvenile convictions or even a single traffic ticket. PSR at ¶¶ 49-53. Perhaps the best assessment of the Court's need to protect the public from Rita Hartman is the status of her pretrial supervision. After appearing before a U.S. Magistrate Judge pursuant to a

summons on September 11, 2023, for an initial appearance, the Court released Ms. Hartman on unsupervised bond. D.E. 4. The PSR writer reported no violations of pretrial release. PSR at ¶ 5. The public does not need protection from Rita.

The PSR's special conditions of supervision adequately address any concerns regarding the need to protect the public in the future. The proposed conditions would ensure that the U.S. Probation Office (USPO) approves any job in which Ms. Hartman might have discretionary authority over financial matters. *Id.* at ¶ 99. While under supervision, she would not be able to incur new credit charges or open any lines of credit without USPO's approval. *Id.* at ¶ 100. She would also have to immediately provide USPO access to any and all requested financial information. *Id.* at ¶101.

Rita pled guilty and accepted responsibility for her actions. This federal conviction that will forever stain her criminal record, tarnish her professional reputation and discolor years of service to her community. Ms. Hartman will also lose some of the basic civil rights that she has exercised as a United States citizen. She will no longer have the right to vote, to serve on a jury, run for public office or to bear arms.

The gravest, and arguably the most important, challenge Rita Hartman must overcome is the financial restoration to Frontier/MRCU. Paying back the money she stole could easily take the rest of her life. Although Rita is beyond retirement age, she understands that paying back her debt means forfeiting the ability to retire in this stage of her life. The Sentencing Commission underscores the Court's

consideration of Rita's age in U.S.S.G. § 5H1.1 as a basis for downward departure: "age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient and less costly than incarceration." PSR at ¶109.

### 3. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

In this case, imposing the guideline sentence requested by the government would promote unwarranted sentence disparities among those, like Rita, who are sentenced under USSG § 2B1.1, in Zone D of the sentencing table and over age 60 with a criminal history category I. Sentencing commission data shows that in the last five years (2020-2024) 55.8% of similarly situated people nationally received a sentence of less than two years. United States Sentencing Commission, *Interactive Data Analyzer*, (accessed September 29, 2025), available at: https://ida.ussc.gov/analytics/saw.dll?Dashboard. In this same population, 30.7% of offenders received a sentence between two and five years. *Id*.



Combined, 86.5% of offenders in the population received lower sentences than Rita's currently calculated range of 63-78 months.

Furthermore, imposing a noncustodial sentence in a fraud case where the Defendant is over age 60 with no criminal history is not an anomaly in the District of Kanas. Specifically, a quarter of similarly situated defendants in the District Kanas received noncustodial sentences in the last five years. *Id.*

The figure includes the 8 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure.
Alternatives include all cases in which individuals received conditions of confinement as described in USSG §5C1.1.
**FILTER:**
Fiscal Year: 2020,2021,2022,2023,2024; Circuit: All; State: All; District: Kansas; Race: All; Gender: All; Age: Over 60; Citizenship: All; Education: All; Crime Type: Fraud/Theft/Embezzlement; Guideline: §2B1.1; Drug Type: All; Sentencing Zone: D; Criminal History: I; Career Offender Status: All

**Conclusion**

Based on the § 3553(a) factors discussed above, Rita Hartman requests this Court sentence her to five years of federal supervision with a condition of home confinement for two years. Such a sentence would place Rita in the best position to repair the harm she caused to Frontier/MRCU. It would reflect the seriousness of Rita's offenses while taking into consideration her record of service to the Atchison

community, her age and physical condition, her lack of criminal history, and her ability to work toward paying restitution. This sentence is consistent with §3553(a) and would not be greater than necessary to achieve its ends.

>   Respectfully submitted,
>
>   s/ Laquisha Ross
>   Laquisha Ross, #26834
>   Assistant Federal Public Defender
>   For the District of Kansas
>   500 State Avenue, Suite 201
>   Kansas City, Kansas 66101
>   Telephone (913) 551-6944
>   Fax: (913) 551-6562
>   Email: laquisha_ross@fd.org
>   Attorney for Defendant

## CERTIFICATE OF SERVICE

I certify that on September 30, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all interested parties.

>   s/ Laquisha Ross
>   LAQUISHA ROSS, #26834